IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PAUL BURRITT,

                Plaintiff,

    v.

LISA DITLEFSEN and POLK COUNTY,

                Defendants.

OPINION & ORDER

12-cv-909-wmc

---

In late November of 2011, an eleven-year-old child falsely accused plaintiff Paul Burritt of sexually assaulting her. Based on that accusation, as well as some other, arguably corroborating evidence, Burritt was arrested for criminal sexual assault approximately one week later without a warrant by defendant Lisa Ditlefsen, a sheriff investigator for Polk County, Wisconsin, and then held in jail for one day before being freed on bail. At the time of Burritt's arrest, Ditlefsen also seized Burritt's GPS device pursuant to a validly issued warrant, which would eventually produce evidence of Burritt's innocence. When confronted, the child admitted to fabricating the story of the sexual assault, apparently in an attempt to manipulate her parents.

Burritt then brought suit in this court against Ditlefsen and Polk County for false arrest and imprisonment in violation of the Fourth Amendment and 42 U.S.C. § 1983, as well as state common law claims for false imprisonment, defamation, malicious prosecution and negligence.[1] Pending before the court is defendants' motion for summary judgment on all of plaintiff's claims. (Dkt. #31.) Because one might reasonably debate whether probable cause existed at the time of Burritt's arrest and because Sheriff Investigator

---

[1] The court has supplemental jurisdiction over Burritt's state law claims. 28 U.S.C. § 1367(a).

Ditlefesen acted upon the direction of the Polk County District Attorney, the court finds that she is entitled to qualified immunity as a matter of law.  The court also finds the federal law claims asserted against Polk County fail as a matter of law, because Burritt has failed to offer evidence demonstrating:  (1) he suffered a deprivation of a federal right as a result of policy, custom, or the decision of a final policy-maker; and (2) any arguable failure by the County to train or supervise its employees that supports a finding of deliberate indifference.  Finally, the court declines to exercise supplemental jurisdiction over Burritt's state law claims and dismisses them without prejudice.

UNDISPUTED FACTS

**I.  The Parties**

Plaintiff Paul Burritt lives in Polk County, Wisconsin.  On November 1, 2011, he was hired as a driver for Handi-Lift Transportation, Inc. ("Handi-Lift"), a business that provides transportation to medical appointments for local residents.  Burritt was still employed there at the time of the incidents involved in this case.

Defendant Lisa Ditlefesen is an investigator for the Polk County Sheriff's Department and has been employed there since January 2002.  She was assigned to the Investigations Unit in November 2003 and specializes in the investigation of "sensitive crimes" involving allegations of sexual assault, child sexual assault, child abuse or neglect and internet crimes against children.  Pursuant to this assignment, she received specialized training from the Department of Justice and Fox Valley Technical College; she has handled approximately 500 sensitive crimes investigations since 2003.

Polk County is a government entity and political subdivision of the state of Wisconsin and is located in the Western District of Wisconsin.

## II. Background

On November 23, 2011, Burritt was assigned to pick up one of Handi-Lift's customers, SMH, an eleven-year-old child who spent a portion of each school day at Impact, a non-residential structured therapeutic treatment program for children.  Impact is located in Hayward, Wisconsin.  Handi-Lift had contracted to transport SMH from Impact to her home in Birchwood, Wisconsin, located approximately 28 miles due south of Hayward on Highway 27 and county roads F and DD.  Burritt was not SMH's regular driver; in fact, November 23rd was the first time that Burritt had any contact with Impact or with SMH.

Sometime between 4:00pm and 4:15pm that day, Burritt picked up SMH at Impact.  The distance between Impact and SMH's home is approximately 30 miles.  At some point during the drive, SMH used Burritt's cell phone to call her mother to inform her that they would be late.  The parties dispute how long the trip from Impact to SMH's home would ordinarily take, but a Google maps printout suggests it should take "about 42 minutes." (*See* Decl. of Peter J. Nickitas Ex. 1 (dkt. #48-1).)

At 5:44, Burritt stopped for gas at the Rice Lake Cenex, 2022 Cenex Drive, Rice Lake, Wisconsin, another 20 miles south and west of Birchwood.  The parties dispute what time SMH ultimately arrived home that night, but it appears to have been sometime between 6:14pm and 6:45pm.  Thus, the minimum time that the trip took on November 23rd would have been about 2 hours (approximately 1 hour and 15 minutes longer than

usual); the maximum would have been about 2 hours and 45 minutes (approximately 2 hours longer than usual).

## III. SMH's Original Accusation and Interview

On November 28, 2011, SMH told an Impact counselor that a Handi-Lift driver had assaulted her on November 23rd.  The counselor, Debbie Schlapper, contacted the Hayward Police Department.  Officer Ryan Ignace responded and met with SMH, who did not respond to him.  He asked if SMH would be more comfortable speaking to a female officer, and she nodded.  Accordingly, Sara Ross Poquette of Sawyer County Health & Human Services agreed to interview SMH.  Poquette arrived at Impact and met with Ignace, SMH, SMH's mother Dawn Schultz, and SMH's stepfather Todd Schultz.  Ignace informed everyone the interview would be recorded, and all of the parties consented.

During the interview, Poquette reviewed the differences between truth and lies with SMH, who provided examples suggesting that she understood.[2]  Poquette then asked SMH if lying has consequences, and SMH said yes and again provided examples.  SMH stated that the Handi-Lift driver, whom she identified as "Skip," had never been her driver before November 23rd, but that on that date, he had done bad things to her.  SMH also stated that "Skip" had driven a different route than her usual driver, but that she had been too afraid to say anything.  She reported that "Skip" had yelled out the window; used vulgar

---

[2] Plaintiff has objected to nearly all of defendants' proposed findings of fact as to what SMH stated during the interview as inadmissible hearsay.  (*See, e.g.*, Pl.'s Resp. to DPFOF (dkt. #50) ¶¶ 44-82.)  As defendants point out, however, these statements are not being offered for the truth of the matter asserted and, therefore, are not hearsay by definition.  Fred. R. Evid. 801(c)(2).  Indeed, it is undisputed that SMH's statements themselves were *false*.  Rather, the statements are being offered to demonstrate their effect on Ditlefsen.  *See United States v. Norwood,* 798 F.2d 1094, 1097 (7th Cir. 1986) ("When it is proved that D made a statement to X, with the purpose of showing the probable state of mind thereby induced in X, . . . the evidence is not subject to attack as hearsay.") (quoting C. McCormick, *McCormick on Evidence* § 249 (3d ed. 1984) (alteration in original)).

and sexual language; told her that he worked for an ambulance and had delivered four babies; and had made graphic threats to a mother after one delivery when she refused to name the baby after him.

SMH reported that "Skip" drove her to a house in the country that had sheds on the property and looked like an old farm without any farm animals.  Poquette asked SMH to draw a picture of the house and surroundings, and SMH produced a drawing with a house, wooded areas, a curved gravel driveway, a spot where the van had supposedly parked, and the location of a walkway.  SMH also said that the house was located some distance from the highway and that it was "grayish" with "weird stairs" and a dirt walkway.  She said that "Skip" had gotten out of the van and let his six dogs out, one of which was a pit bull.

SMH then reported that "Skip" walked quickly back to the van, opened the sliding van door where SMH was seated and touched her.  Poquette asked SMH to identify on a human body diagram where she had been touched; SMH identified, both verbally and on the diagram, the neck, front of the chest and lower private part area.  She said that "Skip" had first touched her on top of her clothes and then had tried to unzip her pants, and that she pushed his hand away, screamed "get away from me," kicked him and slammed his hand in the door.  SMH did not think she left a mark on the man's hand because she did not slam the door that hard.  SMH claimed that the driver had then punched her twice in the left inside knee area, which left two small bruises on her knee.  She stated that "Skip" had then said something like, "I really wanted to have you."

SMH drew a picture of the van and where she had been seated.  She claimed that "Skip" had closed the van door all the way, put the dogs back in the house and started driving again.  She stated that he was driving fast because she saw a speed limit sign that

said "53," and he was driving "70."  She also stated that she saw the Dinner Bell Restaurant in Trego, Wisconsin, and that "Skip" stopped at a gas station near Rice Lake, pumped gas and bought something in a brown paper bag that she thought was beer.  SMH claimed that "Skip" had offered her food and drink, but that she said she did not want anything.  Finally, she claimed she was dropped off away from her driveway, near a silage pile, because "Skip" was too scared to drop her off in the driveway, and that he told SMH to say they made a "ding dong disaster," went the wrong way and missed a turn, causing her to be late.

Following the interview between Poquette and SMH, Officer Ignace then interviewed SMH's mother and stepfather, Dawn and Todd Schultz.  Dawn told Officer Ignace that SMH had called her on the night of the alleged assault, and that SMH had said the van driver told her to call and say they had made a wrong turn and were going to be late.  She stated that SMH did not sound right on the phone.  Dawn also said that SMH had begun having night terrors on the night of the alleged assault, and that Todd and she were very strict about honesty at home.  Todd Schultz reported having observed tire tracks by the silage pile, where SMH reported being dropped off.  During this conversation, Poquette did not have any concerns about SMH's reliability or suggestibility.

On November 28, 2011, Bill Lussier relayed SMH's allegations to Burritt and directed him to write his own report of the transportation of SMH and to have his hand examined at Amery Clinic.  Burritt had his hand examined by Nurse Mickelson that same day and faxed his statement and the report, which indicated his hand was uninjured.  Bill Lussier submitted those reports to the Hayward Police Department the next day.

On November 29, 2011, Officer Ignace returned to Impact and photographed a bruise on SMH's knee.  He also contacted Handi-Lift and spoke to the owner, Bill Lussier,

6

requesting information about "Skip."  In response, Lussier provided Burritt's full name, date of birth and address, as well as the Handi-Lift transport log that Burritt had prepared.  The log showed an odometer reading indicating that Burritt had traveled 121 miles during the October 23, 2011 transport of SMH from Impact to her home -- slightly less than four times the trip's actual length.

That same day, Hayward Police Assistant Chief Faulstich and Officer Ignace photographed Burritt's property.  Officer Ignace noticed several vehicles with EMT license plates.  There were three buildings between the house and farm field, but no farm animals visible; there were, however, several dogs outside, and several more could be heard inside the house.  The police ultimately determined that the alleged assault had taken place in Polk County and referred the case to the Polk County Sheriff's Department.

On November 29, 2011, Sawyer County Department of Child Protective Services worker Lisa B. Humphrey and Supervisor Sue Hendricks wrote a report containing the following language:

> DESCRIBE ANY PRESENT DANGER THREATS, INCLUDING A DESCRIPTION OF POSSIBLE OR LIKELY EMERGENCY (EXIGENT) CIRCUMSTANCES.
>
> No Present Danger Threats

(Nickitas Decl. Ex. 1 (dkt. #55-1).)

**IV. Referral to Polk County**

On December 1, 2011, Investigator Lisa Ditlefsen received a voicemail from Faulstich informing her of a possible sexual assault case involving SMH.  The next day, she

spoke to Faulstich and learned details from the Hayward Police Department investigation and interview of SMH.[3]  Faulstich informed her:

- On November 23, 2011, Handi-Lift was contracted to drive SMH from her school to Impact and from Impact to her home.

- Burritt drove SMH from Impact to her home in Birchwood, Wisconsin.

- The distance between Impact and SMH's house was 30.5 miles and should have been a 40 minute drive.

- SMH had reported being taken to Burritt's home in Polk County, where Burritt had sexual contact with her.

- Fautstich and Officer Ignace found that the description SMH provided matched Burritt's home and property, including the presence of multiple dogs.

On the same date, Ditlefsen learned that Poquette had conducted an interview with SMH.  The parties agree that Poquette is a qualified social worker.  Ditlefsen contacted Poquette to obtain her opinions regarding the interview with SMH.  Poquette confirmed she had conducted an interview with SMH and told Ditlefsen the following:

- SMH understood the difference between telling the truth and telling a lie.

- SMH understood there were consequences to telling a lie.

- SMH met the statutory requirements for a statement by a juvenile.

- In Poquette's opinion, SMH was credible and trustworthy and had provided sufficiently detailed information regarding the alleged assault.

---

[3] As with SMH's interview, the court considers these out-of-court statements, as well as those made by Poquette in her conversation with Ditlefson that same day, to show their effect on Ditlefsen, rather than for the truth of the matter asserted.

During her conversation with Poquette, Ditlefsen also learned of SMH's statements that Burritt had tried to unzip her pants and that she had fought back by kicking him and slamming his hand in the door, as well as SMH's claim that Burritt had punched her in the leg and left bruises. Poquette informed Ditlefsen that Officer Ignace had photographed the injuries. Ditlefsen also learned that SMH claimed they had been traveling at 70 miles per hour and claimed to have seen a sign showing a speed limit of "53 miles per hour." Poquette reported that SMH had been about 1.5 hours late getting home that night and agreed to send Ditlefsen her interview notes and a CD of the interview.

As of December 2, Ditlefsen had received by fax the following documents from the Hayward Police Department:

- Burritt's November 28, 2011 statement, which included a statement relating to GPS and cell phone use.

- Burritt's examination by Nurse Mickelson.

- Schlapper's notes, signed by SMG.

- SMH's drawing of Burritt's home.

- SMH's drawing of Burritt's vehicle and the placement of Burritt and herself inside.

- SMH's drawing of the drop-off.

- Body drawing by SMH.

- Handi-Lift Transport Log for SMH completed by Burritt.

- Hayward Police Department report, including SMH interview summaries.

By e-mail, she also received:

- Photographs of Burritt's home and property.

- Photographs of SMH's knee.

9

## V.  Ditlefsen's Investigation

Also on December 2, 2011, Ditlefsen contacted Bill Lussier, who owned Handi-Lift.  Lussier sent Ditlefsen a fax advising that Burritt had been hired on November 1, 2011; attached was the trip sheet for the transportation of SMH on November 23, 2011.[4]  The trip sheet gave an odometer reading of "218,267" at pick-up, and "218,388" at drop-off.  In the box labeled "Miles to Drop-Off," someone had written "21," although the odometer readings made clear the actual number of miles driven was 121.  Burritt had signed the transport sheet.

Later that day, Ditlefsen contacted Dawn Schultz to verify certain facts.  Schultz stated that SMH was approximately 1.5 hours late getting home on the night of the alleged assault and had arrived home between 6:30 and 6:45 P.M.  Schultz confirmed that SMH was usually picked up from Impact around 4:00 P.M. and arrived home between 4:30 P.M. and 5:00 P.M.; she also confirmed that Burritt was not SMH's usual driver.

Ditlefsen then used Mapquest to map the route between Impact and SMH's home; Mapquest provided a route that was 30.58 miles and took about 40 minutes.  (*See* Ditlefsen Decl. Ex. A (dkt. #38-1).)  She also mapped a route between Impact and Burritt's home, using Highway 63 to Highway 53 to Highway 8; that route was about 74.38 miles and took about 1 hour and 23 minutes.  (*See* Ditlefsen Decl. Ex. B (dkt. #38-2).)  She mapped a second route between Impact and Burritt's home, which was about 61.56 miles and took about 1 hour and 20 minutes.  (*See* Ditlefsen Decl. Ex. C (dkt. #38-3).)  Next, she mapped a route from Burritt's home to SMH's home, using a route of Highway 8 to Highway 53

---

[4] The undisputed proposed findings of fact state that the trip sheet was for a trip on September 23, 2011, but this was apparently marked in error.  (*See* Ditlefsen Dep. Ex. 4 (dkt. #25-4).)

under the assumption that SMH's sighting of a 53 mph speed limit was actually a sighting of the highway number.  That route was about 50.81 miles and took about 1 hour and 2 minutes.  (*See* Ditlefsen Decl. Ex. D (dkt. #38-4).)

On December 4, 2011, Burritt voluntarily stopped driving for Handi-Lift, although apparently he did not inform the Polk County Sheriff's Department of his leave of absence.  (*See* Burritt Dep. (dkt. #30) 38:6-40:1.)  At some point during her investigation, Ditlefsen learned that Burritt was not going to be transporting children, but it is also unclear when that was.  (*See* Ditlefsen Dep. (dkt. #25) 122:15-25.)

During her pre-arrest investigation, Ditlefsen spoke with Bill Lussier at least two or three times.  The parties dispute whether:  (1) she claimed at that time to have Burritt's GPS data and that the data indicated he was not where he had claimed to be; (2) she stated "We've got him"; (3) she claimed to have driven the route Burritt had taken, without having actually done so; and (4) she stated that SMH's drawing was the "spitting image" of Burritt's house.

On December 5, 2011, Ditlefsen received Poquette's typed report, the CD interview and the prepared statements.  She began to prepare an affidavit in support of a search warrant and, as per her usual practice, she received an aerial image of Burritt's property from Polk County's Geographic Information Server.  That same day, Ditlefsen submitted to Polk County Circuit Court Judge Jeffery Anderson Poquette's affidavit, application for search warrants related to Burritt's cell phone records and the Garmin GPS unit in the van. Judge Anderson found probable cause to issue both search warrants.

11

### VI. Other Polk County Officials' Involvement

During the investigation, Ditlefsen was supervised by Captain Steve Smith, with whom she met multiple times before Burritt's arrest. During these meetings, she advised Smith of the status of the investigation. Smith had been a law enforcement officer with the PCSD since 1986; one of his responsibilities was to act as liaison to the District Attorney's office. Smith also was responsible for reviewing every report prepared by PCSD officers and delivering them to the District Attorney's office, so they could be added to the case file. Smith was aware that Ditlefsen was seeking a search warrant for phone records and a GPS. He was aware that Burritt was going to be arrested, and he ultimately supported the decision to arrest made by the District Attorney.

Ditlefsen also contacted and met with Polk County District Attorney Daniel Steffen, as was her usual practice during sexual assault cases. Steffen had been admitted to the Wisconsin Bar in 1998 and worked as a private attorney practicing family law and criminal defense until his election to the position of Polk County District Attorney in 2006. Steffen handled the Burritt case, as he handled the majority of felony cases for the District Attorney's office, as well as reviewed the case and made the charging decision. The case was particularly significant because the allegations included sexual assault of a minor by someone who came into regular contact with minors during his Handi-Lift employment, as well as in his job as an ambulance driver. DA Steffen (1) reviewed the search warrants before they were submitted; and (2) informed Ditlefsen that she could take Burritt into custody without getting a warrant for his arrest first.

## VII.   Burritt's Arrest

On December 6, 2011, Ditlefsen traveled to Burritt's home to take him into custody and execute the search warrant, but Burritt was not home.   Pursuant to Steffen's instructions, Ditlefsen, along with Investigator Lehman and Deputy Hall, traveled back to Burritt's home on December 7, 2011, at 7:35 A.M. to execute the search warrant.   Ditlefsen explained to Burritt that she had a search warrant for the GPS unit *and* that she was taking him into custody.[5]   Ditlefsen also photographed the property and counted six dogs.

Deputy Hall transported Burritt to the Sheriff's Department, where he was placed in an interview room.   After Ditlefsen read Burritt his *Miranda* rights, he waived the right to have an attorney present.   Ditlefsen interviewed Burritt, who said that he had gotten lost and claimed that his hand was not injured.   Ditlefsen completed a probable cause report and booked Burritt into jail.

Captain Smith provided the contents of the file relating to the Burritt/SMH case to District Attorney Steffen, who makes the charging decision.   In the Burritt/SMH criminal case, D.A. Steffen reviewed the file, made the decision and intended to prosecute the case himself.   A paralegal in the D.A.'s office prepared the criminal complaint, which charged Burritt with the felony crimes of First Degree Child Sexual Assault – Contact with a Child under Age 13 and Child Enticement.   Assistant D.A. Stephen Dorrance signed the original

---

[5] "Allegations of unlawful arrests in the home ordinarily call for separate determinations of the propriety of the initial entry into the home and the subsequent arrest."   *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1243 (7th Cir. 1994).   Though neither party proposes any facts related to the entry, it appears from Ditlefsen's incident report and from Deputy Hall's supplemental report that Burritt invited the officers into his home.   (*See* Ditlefsen Dep. Ex. 26 (dkt. #25-26) 4 ("After a short conversation and Investigator Ditlefsen advising BURRITT that we had a search warrant, he did invite us into his residence."); *id.* at 9 ("I advised that I had a search warrant.  PAUL invited us into his home.").)   In any event, Burritt does not appear to argue that the entry into his home violated the Constitution.

criminal complaint.  Dorrance also placed Captain Smith under oath, and Captain Smith then reviewed and signed the criminal complaint as well.

On the afternoon of December 7, 2011, Assistant D.A. Dorrance appeared on behalf of the state at Burritt's bail hearing.  Burritt was released on bail that afternoon.

## VIII.  Continued Investigation

Ditlefsen continued to investigate the case following Burritt's arrest.  She contacted Handi-Lift and asked for a copy of the receipt from the Rice Lake Cenex; Connie Lussier faxed it to her along with the fuel log.  The receipt indicated that Burritt had purchased gas at 5:44 P.M.  The fuel log indicated that the odometer read "218,361" at the time Burritt purchased gas, which meant that he had driven 94 miles between picking up SMH and stopping at the gas station.

On December 9, 2011, Dawn Schultz contacted Ditlefsen and advised her of new information that SMH was now reporting, including that her pants had been pulled down during the assault, that she had scratches with scabs on her inner thighs and that she was "spotting."  SMH also stated that she was afraid to tell the social worker about what had really happened, because she did not want to show her injuries.  Ditlefsen asked to schedule another interview with SMH and then contacted the Rice Lake Cenex, requesting video surveillance.  Video surveillance was unavailable.  Ditlefsen also asked if there was another receipt for an alcohol purchase and was advised that the Cenex did not sell alcohol.

On December 12, 2011, Dawn Schultz again contacted Ditlefsen, advising her that SMH had been examined and there was a laceration and bruising to her genital area.  An additional interview with SMH was scheduled for December 16.

14

Polk County has a practice of sending probable cause reports to the media on Monday mornings. Sheriff Johnson, a law enforcement officer who had been with the PCSD since February 1, 1999, reviewed the probable cause report that Ditlefsen prepared before sending it to the media. Johnson determined that there was probable cause in the case. On Monday, December 12th, Johnson e-mailed a standard packet of probable cause reports to news media outlets (*e.g.*, local newspapers, radio stations and Twin Cities news outlets), which included the report prepared in Burritt's case.

On December 13, 2011, Ditlefsen delivered the GPS unit to Deputy Shawn Demulling of the St. Croix County Sheriff's Department, who had agreed to examine it because no one at the PCSD had the necessary expertise to conduct a forensic examination of the GPS, while Demulling was specially trained to do so. On that same day, Ditlefsen also obtained Burritt's cell phone records, indicating that SMH had made two calls to her mother at 5:01 and 5:02 P.M. The first call registered on a cell tower located at 25502 Tower Road, Webster, Wisconsin, which Ditlefsen mapped and determined was northwest of Siren, Wisconsin off of County Highway D. The second call registered at 24675 Bashaw Lake Road, Hertel, Wisconsin, also near Siren. The information suggested that Burritt had been traveling westbound on Highway 70 toward Siren. Ditlefsen reviewed the transport sheet, which indicated that on November 23, 2011, Burritt's starting address had been the home of Catherine Savo in Siren. On December 14, 2011, Ditlefsen met with Savo, who remembered that Burritt had been her driver, but did not recall anything else.

Ditlefsen then contacted Handi-Lift and requested Burritt's full November 23rd schedule. His cell phone records corresponded to the transport records. Accordingly, on December 13 or 14, 2011, Ditlefsen contacted Assistant Chief Faulstich and advised him

15

that the cell phone records supported Burritt's claim that he was near Siren, rather than his home in Turtle Lake, Polk County.

On December 16, 2011, Ditlefsen interviewed SMH.  During this interview, SMH again gave a detailed description of the place where she said the sexual assault took place. She reported that Burritt had let his dogs out at the property, and allegedly remembered seeing a pit bull, a hound and a lab.  She described Burritt's driveway as going straight in and to the left, and said there were trees to the side of the house and behind it.  She also produced another drawing of the property, and she described how Burritt took her out of the van, carried her to the lawn and laid her down.  She claimed that Burritt had removed her pants and underwear over her shoes, pulled his own pants down and tried to penetrate her.  She stated that it hurt, so she kicked him and ran back to the van, trying to pull her pants up.  SMH then added that she had her pants and underwear in her hand and was trying to put them on while running.  Ditlefsen asked SMH to retell certain portions of the story multiple times to test her.

On December 20, 2011, Ditlefsen received medical records from Marshfield Clinic in Rice Lake.  The records revealed there was some evidence of bruising and a laceration in SMH's genital area.  On December 22, 2011, Ditlefsen met with Demulling, who had completed the analysis of the GPS unit for November 23, 2011.  The routing information on that unit showed that Burritt had come within 5-10 miles of the northern border of Polk County, but never entered it during the entire transport of SMH, and that Burritt was never close to his home in Turtle Lake, some 25 – 30 miles further south.

16

### IX. SMH Recants and Charges are Dismissed

The next day, December 23, 2011, Ditlefsen contacted Burritt and advised him that she was going to recommend to the District Attorney that the charges be dismissed.  Next, she contacted Dawn Schultz and told her that the GPS information and cell phone records indicated that Burritt had never been near his home, as SMH seemed to be reporting.  She also asked to interview SMH again.

On January 3, 2012, Ditlefsen interviewed SMH, who admitted to lying about the assault because she did not want to attend Impact.  Ditlefsen contacted the District Attorney and advised him that SMH had recanted; SMH was then referred to Polk County juvenile justice for possible charges.  Ditlefsen completed a juvenile referral regarding SMH and recommended that SMH be charged with a felony for false swearing.  Ultimately, SMH pled to a misdemeanor obstruction of justice charge.

On January 4, 2012, Steffen filed a formal motion to dismiss the criminal charges against Burritt, which Judge Anderson signed.  On January 6, 2012, Sheriff Johnson also e-mailed information about the dismissal of the charges against Burritt to the same media outlets that had received the probable cause reports on December 12, 2011.  The December 12th probable cause report and the January 6 dismissal report were the only contacts Johnson had with the news media regarding the charges against Burritt.

### X.  Polk County Practices

Steven Moe is the PCSD Chief Deputy and has responsibility for implementing and enforcing all PCSD policies and procedures.  Moe has 31 years of experience in law enforcement and has been employed by the Polk County Sheriff's Department since June of 1982.  He has been Chief Deputy since March 11, 1991.

17

The Polk County Sheriff's Department has implemented policies and procedures for its employees.  (*See* Moe Decl. Ex. 1 (dkt. #36-1).)   The handbook introduction explains that its goal is "to structure and legitimize the discretion that has been successfully used in this department for many years."  (*Id.* at 1.)  Section 600-2-1, entitled "Probable Cause," states:

> When an officer, in good faith, believes a crime has been committed and that the person in question has committed it, and his belief is based on such grounds as would induce an ordinary, prudent and cautious officer, under these circumstances to believe likewise, then, the officer has 'probable cause' for his belief and is justified in making an arrest without a warrant.

(*Id.* at 18.)

The next section, 600-3-0, entitled "Arrest Policy," states:

> For purposes of this chapter, an arrest is an act which takes an individual into physical custody with the intent of furthering criminal proceedings against the person.  An arrest is a restraint on liberty.  All law enforcement officers have an obligation to make an arrest in certain circumstances.  Officers also have an obligation to protect all persons['] right to life and liberty. These two issues must be carefully weighed and considered when an officer makes a decision to [e]ffect a custodial arrest.

(*Id.* at 20.)  The handbook goes on to state that "[t]he best practice is to obtain an arrest warrant whenever practical."  (*Id.*)  Nevertheless, the handbook states that a deputy "may make an arrest" when he or she has a warrant or "[e]stablishes probable cause (reasonable grounds) to believe that the person is committing or has committed a crime."  (*Id.*)  It states that "Deputies with the Polk County Sheriff's Department shall not make a warrantless arrest without first establishing probable cause."  (*Id.* at 18.)

Finally, the handbook states that:

> When an officer of this department arrests another person, the officer will, or will cause another officer to[,] complete a written probable cause statement which fulfills the requirements of the *Riverside Decision.*   This P.C. statement must contain enough information to support the arrest and address all of the elements of the alleged crime.   It shall be prepared without undue delay and be filed with the jail staff.

(*Id.* at 21.)


OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the initial burden is met, for an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If he fails to do so, "[t]he

19

moving party is 'entitled to a judgment as a matter of law.'" *Id.* at 323.   Here, Burritt simply cannot meet his burden.

## I.  42 U.S.C. § 1983 Claims

### A.  Claims against Lisa Ditlefsen

#### i.    Legal Standard for False Arrest and Imprisonment Claims

Burritt asserts numerous federal claims against Sheriff Investigator Ditlefsen, alleging that her action in arresting him on December 6th and his subsequent day-long confinement in jail constituted an unconstitutional seizure in violation of the Fourth Amendment. Defendants acknowledge that Ditlefsen did not acquire a warrant before arresting Burritt. The relevant question is whether probable cause existed to justify Burritt's arrest without a warrant, since "[t]he existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest or false imprisonment." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 713-14 (7th Cir. 2013) (citing *Mustafa v. City of Chi.*, 442 F.3d 544, 547 (7th Cir. 2006)).   Probable cause justifying an arrest exists "when a reasonable officer with all the knowledge of the officers on the scene would have believed that the suspect committed an offense defined by state law." *Jones v. Clark*, 630 F.3d 677, 684 (7th Cir. 2011).

Probable cause "deals not with hard certainties but with probabilities." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).   "[A]lthough it requires something more than a hunch, probable cause does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity – the officer's belief that the arrestee was committing a crime need only be reasonable." *Id.* (citations omitted).   Determining whether an officer had probable cause to effect an arrest "entails a purely objective inquiry; the

officer's subjective state of mind and beliefs are irrelevant." *Id.* (citations omitted).  The focus is what the officer knew at the time of arrest.  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).  The court must then determine whether those facts and circumstances amount to probable cause when "viewed from the standpoint of an objectively reasonable police officer." *Abbott*, 705 F.3d at 714 (quoting *Pringle*, 540 U.S. at 371) (internal quotation marks omitted).

Because police officers operate in the real world, "often in rapidly unfolding and even chaotic circumstances," courts must consider the facts "not as an omniscient observer would perceive them but . . . as they would have appeared to a reasonable person in the position of the arresting officer – seeing what he saw, hearing what he heard." *Id.* (quoting *Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 457 (7th Cir. 2010)) (alterations in original) (internal quotation marks omitted).  "A police officer may of course exercise common sense and draw upon his training and experience in evaluating the totality of the circumstances confronting him, and a court must likewise make allowance for such judgments in deciding what the arresting officer reasonably might have concluded about the facts." *Holmes v. Vill. of Hoffman Estate*, 511 F.3d 673, 679 (7th Cir. 2007).

The question of exigency is also relevant to the inquiry. *See BeVier v. Hucal*, 806 F.2d 123, 127 (7th Cir. 1986) ("Under Seventh Circuit precedent, then, probable cause is a function of information and exigency.").  "The amount of information that prudent police will collect before deciding to make a search or an arrest, and hence the amount of probable cause they will have, is a function of the gravity of the crime, and especially the danger of its imminent repetition." *Llaguno v. Mingey*, 763 F.2d 1560, 1566-67 (7th Cir. 1985), *abrogated on other grounds*, *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991); *see also Mason v.*

21

*Godinez*, 47 F.3d 852, 855-56 (7th Cir. 1995) (reaffirming *Llaguno* court's discussion of exigency).

With regard to summary judgment, this "probable cause determination must be made by a jury 'if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.'" *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008) (quoting *Maxwell v. City of Indianapolis*, 998 F.2d 432, 434 (7th Cir. 1993)). "If the underlying facts supporting the probable cause determination are not in dispute, the court can decide whether probable cause exists." *Maxwell*, 998 F.2d at 434.

Were this the only question, this court might be inclined to let the matter proceed to trial, but it is not. Even if this court or a jury were to find that Ditlefsen lacked probable cause, she may still be entitled to summary judgment under the doctrine of qualified immunity. Pursuant to that doctrine, "[p]ublic officials 'performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998). Accordingly, this court must determine whether the officer had "arguable" probable cause -- that is, "whether a reasonable officer could have mistakenly believed that probable cause existed." *Id.*

"As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Officers are entitled to summary judgment on qualified immunity grounds if their actions were not objectively unreasonable at the time they were taken." *Humphrey,* 148 F.3d at 725. Moreover, while qualified immunity is a defense, plaintiff bears

the burden of defeating it.  *See Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir. 2003).

Here, while the existence of probable cause is a close question, Burritt falls well short of defeating Ditlefsen's defense of qualified immunity.  Accordingly, Ditlefsen is entitled to summary judgment on that ground.[6]

### ii.    Probable Cause and Arguable Probable Cause

Perhaps recognizing that he has an uphill battle, Burritt acknowledges at the outset , as he must, that "[w]ith nothing more than a purported sexual assault victim's story, an investigator has probable cause and qualified immunity."  (Pl.'s Resp. (dkt. #57) 4.)  To date, the Seventh Circuit has "consistently held that an identification or a report from a single, credible victim or eyewitness can provide the basis for probable cause."  *Woods v. City of Chi.*, 234 F.3d 979, 996 (7th Cir. 2000); *see also Mustafa v. City of Chi.*, 442 F.3d 544, 548 (7th Cir. 2006) ("Once a reasonably credible witness informs an officer that a suspect has committed a crime, the police have probable cause to arrest the suspect."); *Driebel v. City of Milwaukee*, 298 F.3d 622, 643 (7th Cir. 2002) (citing *Woods*).  Still, as is so often the case in trying to establish bright line, legal rules, this one is not unqualified: the Seventh Circuit has recognized that probable cause may be *lacking* if the officers "have reason to believe [the citizen complaint is] fishy."  *Guzell v. Hiller*, 223 F.3d 518, 520 (7th Cir. 2000).

---

[6] Burritt couches his arguments in terms of *arguable* probable cause and qualified immunity.  The question of probable cause and the question of *arguable* probable cause are "similar to [one another] but distinct."  *Williams v. City of Chi.*, 733 F.3d 749, 758 (7th Cir. 2013).  The Seventh Circuit has articulated the difference as follows:  "whereas an arrest not supported by probable cause is a constitutional violation, an arrest not supported by arguable probable cause is a violation of a 'clearly established' constitutional right."  *Abbott v. Sanamon Cnty., Ill.*, 705 F.3d 706, 715 (7th Cir. 2013).  This is because qualified immunity imposes an "added layer of protection."  *Id.* at 714.  Accordingly, Burritt must overcome the standard of arguable probable cause to proceed.

Pursuant to this recognized exception, Burritt argues that (1) probable cause in this case was negated by "facts in plain view," and (2) Ditlefsen ignored readily accessible evidence in reckless disregard for the truth. As to this latter argument, Burritt quotes from *Betker v. Gomez*, 692 F.3d 854 (7th Cir. 2012).

> We have said that a 'reckless disregard for the truth' can be shown by demonstrating that the officer 'entertained serious doubts as to the truth' of the statements, had 'obvious reasons to doubt' their accuracy, or failed to disclose facts that he or she 'knew would negate probable cause.'

*Id.* at 860.

Burritt's reliance on these exceptions are consistent with the general proposition that a probable cause determination requires considering the totality of the facts and circumstances known to the officer at the time of arrest. *Devenpeck*, 543 U.S. at 152. Rather than just relying on SMH's original statement, therefore, the court will consider whether the *totality* of what Ditlefsen knew at the time of Burritt's arrest -- including both the corroborating evidence and that evidence which tends to undermine SMH's story -- rises to the level of probable cause.

As of December 7, 2011, as already mentioned, Ditlefsen had a detailed statement from SMH, the purported victim, indicating that Burritt had had sexual contact with her.[7] Dawn and Todd Schultz had also corroborated certain details of the story, including: SMH's late arrival home; the phone call, during which SMH did not sound "right"; the tire tracks suggesting SMH had been dropped off by their silage pile rather than at the house; and the onset of night terrors beginning the day of the alleged assault. Furthermore, police

---

[7] Though the parties do not offer much discussion on this point, the court notes that Wis. Stat. § 948.02(1)(e) criminalizes the act of having "sexual contact with a person who has not attained the age of 13 years." Thus, there is no dispute that SMH's statement described Burritt committing an offense defined by state law.

24

reports seemed to corroborate other details from SMH's story.  First, the officers observed multiple dogs at Burritt's property, as SMH had reported.  Second, Ditlefsen had the endorsement of SMH's apparently experienced interviewer, Poquette, who stated that she had no concerns about SMH's suggestibility or reliability.  Third, Ditlefsen had a transportation log with odometer readouts indicating a 121-mile trip that was incorrectly recorded as a 21-mile trip, the latter being far closer to the actual distance from Impact's location in Hayward to SMH's home in Birchwood, Wisconsin.  Fourth, she had SMH's drawing, believed to be of Burritt's house, which included both similarities (*e.g.*, woods around the house and a non-straight driveway) and inconsistencies or missing elements (*e.g.*, omission of the extra buildings and vehicles on the property).  Finally, Ditlefsen had possible mapped routes consistent to that SMH described, which roughly corresponded with the 121 miles the odometer had recorded and with the timing that SMH's mother had reported.

On the above facts alone, an objectively reasonable officer in Ditlefsen's position could certainly find probable cause to believe that Burritt had committed a crime and any arguable inconsistencies were explainable given SMH's age.  For instance, SMH's age could reasonably explain why Burritt's hand was uninjured despite supposedly being "slammed" in a door.  Indeed, during her interview SMH herself stated she would not expect Burritt to have a bruise because she had not slammed the door that hard.  Her age might also have explained why SMH was uncertain of the route they had allegedly taken to Burritt's house.

Most of the other information that later came to light -- for example, that (1) Dawn Schultz had doubts as to the truthfulness of SMH's story[8] and (2) SMH had previously lied about being sexually assaulted -- was simply not known to Ditlefsen at the time she effected Burritt's arrest.  Indeed, viewed in a vacuum, the circumstances at the time of the arrest were indisputably suspicious (particularly the apparent careening around northern Wisconsin instead of taking a relatively short trip due south to Birchwood from Haywood), or at least an objectively reasonable officer might so conclude on this record.

Of course, Burritt is right to point out that Ditlefsen was *also* aware of certain inconsistencies, beginning with Burritt's statement denying that any sexual assault took place, as well as a statement from Nurse Mickelson, concluding that Burritt's hand, which SMH had supposedly slammed in a door, was uninjured.  Ditlefsen also had varying

---

[8] The parties dispute when, if at all, Dawn Schultz informed Ditlefsen of her suspicions.  Burritt has not provided any evidence that Ditlefsen knew of Dawn Schultz's doubts before the arrest took place; his citation to Dawn Schultz's deposition supports only the inference that at *some* point, she informed Ditlefsen of her doubts.  (*See* Dawn M. Schultz Deposition (dkt. #23) 39:18-40:2.)  Schultz also stated that during the initial meeting with the Hayward police, she "had just a mother's instinct gut that I didn't believe her, and I did not tell my husband.  I did not tell anybody." (*Id.* at 65:3-6.)  Later on in the deposition, she testified:

> Q: And before you received that additional information about the pants being pulled down, you hadn't had a conversation with Investigator Ditlefsen where you told her you thought that your daughter was lying, right?
>
> A: No.
>
> Q: So until you received this different information on whatever date that you learned that she was saying her pants were pulled down, you hadn't expressed any concern about lying before that, right?
>
> A: No.

(*Id.* at 66:15-67:1.)  According to the undisputed facts, SMH did not allege that her pants had been pulled down until December 9, 2011, two days *after* Burritt's arrest.  (*See* Pl.'s Resp. to DPFOF (dkt. #50) ¶¶ 259-60.)  Accordingly, even viewing the facts in the light most favorable to Burritt, the *earliest* Ditlefsen would have known of Dawn Schultz's doubts was December 9, 2011.

estimations of the event's timing, with the transportation log showing a start time of 16:15 and an end time of 18:20, and SMH's mother reporting that SMH had arrived home between 6:30 and 6:45.  Most important to the court's analysis, Ditlefsen had information that Burritt had, at some point, stopped for gas in Rice Lake, though she had not yet acquired the time-stamped receipt.  This additional deviation from the route coupled with the already-tight timetable of events that SMH had described calls at least cast some doubt on the events as SMH described them.

Additionally, there are certain facts the parties *do* dispute.  While the parties agree that Ditlefsen had at least two or three conversations with Bill Lussier before arresting Burritt, they do not agree as to the substance of those conversations.[9]  For instance, Burritt alleges that Bill Lussier told Ditlefsen before December 7 that he did not see how Burritt could possibly have made the trip from Impact to his home and then to SMH's home in the time alleged.  (*See* Bill Lussier Decl. (dkt. #47) 4.)  Connie Lussier avers that she expressed similar concerns "about the time, speed, speed limits, and distance, and the known start-and-end times and places."  (Connie Lussier Decl. (dkt. #46) 2.)  While Ditlefsen disputes that such conversations even took place (Resp. to PPFOF (dkt. #62) ¶¶ 182, 188), the court must consider the facts in the light most favorable to plaintiff on summary judgment.  Assuming the Lussiers made these statements, they should at least have drawn further attention to the "fishiest" aspects of the story SMH had told.[10]  At the time of the arrest,

---

[9] Defendants ask the court to strike nearly all of the Lussiers' affidavits as inadmissible on hearsay grounds, but the court is unclear as to why their out-of-court statements would constitute hearsay since:  (1) like many statements by the plaintiff, they are being offered not for the truth, but for their impact on Ditlefsen; and (2) to the extent not disputed by Ditlefsen when made may also constitute statements of a party opponent by adoption.

[10] Burritt also makes much of statements that *Ditlefsen* allegedly made during these conversations,

however, Diflefsen was still left with a largely unexplained suspicious period of time, which mainly contributed to the credibility of SMH that something untoward may have occurred.

A better argument advanced by Burritt is that Ditlefsen ignored evidence that was within her grasp and "readily accessible," such as the time-stamped Cenex receipt and the GPS data.  As support, Burritt cites to *Moore v. The Marketplace Restaurant,* 754 F.2d 1336 (7th Cir. 1985), and *BeVier v. Hucal*, 806 F.2d 123 (7th Cir. 1986).  The court finds neither case particularly helpful to the analysis, however, since they present vastly different factual scenarios to this case.

In *BeVier*, a police officer, Hucal, arrested the parents of two children on suspicion of child neglect, a crime which required that the parents act knowingly or willfully.  806 F.2d at 126.  Not only did Hucal fail to question the parents, the Red Cross Center personnel, or the babysitter before the arrest, the only "evidence" he had was his own observation of the children (who were sitting in direct sunlight and looked listless and sunburned) and the statement of the babysitter, who said she was watching the children and showed him one child's severe diaper rash.

The Seventh Circuit held that Hucal had lacked probable cause to arrest the parents because of his unreasonable failure to investigate.  In so holding, the court first explained that "[a] police officer may not close her or his eyes to facts that would help clarify the

---

which she denies making.  Allegedly, Ditlefsen told Lussier that she had Burritt's GPS and it proved he was not where he claimed to be; stated "We've got him" *before* she acquired the receipt from the Rice Lake Cenex; falsely asserted she had driven the route Burritt had taken; and stated that the drawing SMH made was the "spitting image" of Burritt's house.  Presuming that Ditlefsen made these statements, it is unclear how they help Burritt's case, at least for the purposes of the probable cause inquiry.  If Burritt hopes to demonstrate that Ditlefsen acted in bad faith, that is irrelevant to the question of probable cause:  as already noted, determining whether an officer had probable cause to effect an arrest "entails a purely objective inquiry; the officer's subjective state of mind and beliefs are irrelevant."  *Abbott*, 705 F.3d at 714 (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)).

circumstances of an arrest," and that "[r]easonable avenues of investigation must be pursued." *Id.* at 128. According to the Seventh Circuit, however, pursuing reasonable avenues of investigation did *not* require "that an officer who has established cause on every element of the crime … continue investigating to check out leads or test the suspect's claim of innocence." *Id.* at 128 (citing *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 437-42 (7th Cir. 1986)).

Moreover, in *BeVier,* the court also noted that "without doing some further investigation Hucal had *no* information on the BeViers' intent, an *essential element of child neglect*, and no way to tell whether the children's situation was attributable to the BeViers' decisions." *Id.* (emphasis added). Since information as to the parents' intent "could have been easily obtained and was necessary before concluding that Robert and Annette had intentionally neglected their children," the Seventh Circuit held that "Hucal was unreasonable in not making those inquiries." *Id.*

Unlike *BeViers*, Ditlefsen had some evidence supporting each of the required elements of the charge. Similarly, Ditlefsen did not arrest Burritt with so little evidence in her possession that it was "unclear whether a crime had even taken place." *Id.* On the contrary, she had SMH's statement, which, if believed, established that a crime had taken place; trained professionals and parents who credited her statement; and bruising on her knee. *Cf. Gramenos*, 797 F.2d at 439 ("Vaughn was an eyewitness. The facts he related to the police (if he told the truth) establish a crime."). Though Ditlefsen did not yet have Burritt's cell phone or GPS records, probable cause "does not require police to gather enough evidence to support a conviction or even enough to demonstrate that it was more

likely than not that the suspect was engaged in criminal activity." *United States v. Sloane*, 636 F.3d 845, 849 (7th Cir. 2011).

The Seventh Circuit's *Moore* decision is similarly unhelpful to Burritt. In *Moore*, a deputy was called to a restaurant, where the manager complained that five people had eaten there and left without paying. A waitress stated that the people had also not paid her. The deputy then went to the campground where the group was staying, woke them, asked if they had been at the restaurant that night and then arrested them upon receiving an affirmative answer. With so little to go on, the Seventh Circuit held that the officers' decision to arrest was actionable. Instead, the court held they should have "used reasonable judgment and conducted a proper investigation, inquiring both as to the plaintiffs' presence in the restaurant and the dispute over the bill." *Moore*, 754 F.2d at 1345-46. The court also emphasized that (1) the crime in that case was not serious and (2) there was no threat to the officers' safety to justify their course of action. *Id.* at 1345. In contrast, Ditlefsen was confronted with allegations of an extremely serious crime and she pursued a much more extensive, deliberate investigation before arresting Burritt than did the officers in *Moore*.

This is not to say that Ditlefsen's and, even more so, the district attorney's decision to arrest Burritt somewhat abruptly is not troubling given the (1) possibility that it was physically impossible for him to have driven the route described by the eleven-year-old alleged victim in the available time window, much less stopped along the way; and (2) relative ease by which his actual route could have been (and eventually was) confirmed by consulting Burritt's Garmin GPS unit. Courts generally do uphold determinations of probable cause predicated on the statements of minors alone. *See, e.g.*, *Easton v. City of Boulder, Colo.*, 776 F.2d 1441 (10th Cir. 1985) (upholding arrest based on statements of

30

five-year-old and three-year-old, although they presented some inconsistencies); *see also United States v. Shaw,* 464 F.3d 615, 633 (6th Cir. 2006) (Sutton, J., dissenting) (collecting cases). This is eminently understandable in light of the severe nature of crimes against minors and the strong interest in protecting children from further abuse. *See Easton,* 776 F.2d at 1449 (view that children's statements were suspect to begin with was "an entirely unacceptable point of view"; "[t]o discount such testimony from the outset would only serve to discourage children and parents from reporting molestation incidents and to unjustly insulate the perpetrator of such crimes from prosecution"); Fla. Stat. § 901.15(8) (codifying permissibility of warrantless arrests when probable cause exists to believe the person has committed child abuse and noting that "[a] law enforcement officer who acts in good faith and exercises due care in making an arrest under this subsection is immune from civil liability that otherwise might result by reason of his or her action").

However, the problem here is not just that SMH was young. The problem is that, at the time Ditlefsen effected the arrest, there were substantial questions as to whether, given the timing, the events she described could have happened *at all* -- unlike cases like *Easton,* where "the inconsistencies . . . [did] nothing to undermine the solid core of the children's statements." *Easton,* 776 F.2d at 1450. As troubling is the delay in any arrest for at least a week after SMH reported the attack and then the decision to proceed with an arrest, just as Ditlefsen was executing a warrant that might clear up those questions.

In fairness, Ditlefsen and Polk County only received the case from the Hayward Police Department three days before a decision to arrest was made. Moreover, that decision was made in conjunction with the County's District Attorney seeking a warrant to seize Burritt's cell phone and GPS unit based on probable cause, which a circuit judge found

31

sufficient.  Finally, the court is viewing all this with the benefit of hindsight -- as would a lay jury -- knowing now that the GPS data would result in SMH recanting her whole story, *and* would have saved Burritt the untold embarrassment of the charge both immediately and long term.[11]  Without that benefit, the court is unable to conclude that a reasonable officer could *not* have viewed the facts as they appear to this court on summary judgment and have determined, irrespective of possible geographic and temporal inconsistencies, that a crime had occurred.

In the end, the fact that this question is arguable still results in an award of summary judgment to the defendants, because the constitutional claims against Ditlefsen are barred by the doctrine of qualified immunity.  As previously explained, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley*, 475 U.S. at 341.  That is why courts sometime describe the relevant question as not whether an objectively reasonable officer could find probable cause, but rather whether probable cause was "arguable."  *Humphrey*, 148 F.3d at 725.  "Arguable probable cause exists when 'a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law.'"  *Id.* (quoting *Gold v. City of Miami*, 121 F.3d 1442, 1445 (11th Cir. 1997) (per curiam)).  "Officers are entitled to summary judgment on qualified immunity grounds if their actions were not objectively unreasonable at the time they were taken."  *Id.*

---

[11] As has gotten substantial attention in the media recently, Wisconsin's CCAP website is open to public inspection online and discloses not only convictions, but also felony arrests.  Even if this were not so, stories about Burritt's arrest posted on the internet will likely be discoverable by use of a basic search engine for years to come.  *See* Eric Heisig, *Debate Continues over Attempt to Limit CCAP,* Wis. L.J. (Feb. 6, 2014, 2:00 p.m.), wislawjournal.com/2014/02/06/debate-continues-over-attempt-to-limit-ccap/.

As already discussed, Ditlefsen had substantially *more* evidence supporting her probable cause determination than the report of a single, purported underage victim, which the Seventh Circuit has held is sufficient to establish probable cause for an arrest. *See Woods*, 234 F.3d at 996. Even taking into account the inconsistencies in SMH's report upon which Burritt heavily relies, an objectively reasonable officer in Ditlefsen's position *could* have believed that probable cause existed to effect an arrest. While the decision to arrest without further investigation remains troubling, it was by no means the decision of a plainly incompetent officer or one who knowingly violated the law. On the contrary, given the current state of case law, Ditlefsen certainly would have had reason to believe that a minor's statement, even if imperfect to some degree, gave her the authority to arrest Burritt -- particularly where the crime alleged was so serious.

In an attempt to defeat qualified immunity, Burritt relies heavily on the *Betker* decision, in which the Seventh Circuit noted that qualified immunity might not lie where an officer has "knowingly or recklessly made false statements." 692 F.3d at 860. In that case, a police officer, Gomez, had acquired a no-knock warrant on the basis of a call from the "Gun Hotline." The caller later denied having made certain statements that Gomez included in the affidavit. Given those facts, the Seventh Circuit explained that the appropriate analysis required it to "eliminate the alleged false statements, incorporate any allegedly omitted facts, and then evaluate whether the resulting 'hypothetical' affidavit would establish probable cause." 692 F.3d at 862. Ultimately, the *Betker* court found that "[e]liminating the disputed statements would strip [the officer's] affidavit of details essential to a finding of probable cause," as well as strip the officer's entitlement to qualified immunity as a matter of law. *Id*. at 862.

33

By extension, Burritt essentially argues Ditlefsen is not entitled to qualified immunity because she falsely told the Lussiers that (1) she had Burritt's GPS data, (2) SMH's drawing was the spitting image of Burritt's house, and (3) she had driven the route Burritt took.  The *Betker* decision cannot be stretched so far as to support this argument. On the contrary, the Seventh Circuit anticipated this very argument in *Betker* itself, explaining that an officer who knowingly or recklessly makes false statements "may still get qualified immunity if he can establish that he had an objectively reasonable basis for believing the facts in the affidavit were sufficient to establish probable cause."  *Id.* at 860. Qualified immunity is denied to such officers only if "*no accurate information sufficient to constitute probable cause* attended the false statements."  *Id.* (quoting *Lawson v. Veruchi*, 637 F.3d 699, 705 (7th Cir. 2011) (emphasis added)).

The undisputed facts on summary judgment demonstrate that Ditlefsen did *not* rely on false GPS data or having driven Burritt's possible routes to establish probable cause at the time of arrest.  Instead, she relied and relies on information in hand: SMH's statement, the statements of SMH's mother and stepfather, the transportation log, an unexplained trip that took four to five times longer than usual, and the Hayward police department's reports. As discussed above, whether or not sufficient to establish probable cause, it is undisputed that Ditlefsen falsified none of this evidence.  Accordingly, Ditlefsen is entitled to summary judgment on the § 1983 claims because, at minimum, she had *arguable* probable cause under applicable case law.

### iii.    Extraordinary Circumstances

Ditlefsen is also entitled to qualified immunity under the extraordinary circumstances doctrine, which states that even if a public official's actions violated clearly established law, the qualified immunity defense would still bar suit "if the official [who is] pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard." *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). In particular, where an official acts in reliance on the advice of counsel, the Seventh Circuit has adopted the factors enumerated in *V-1 Oil Co. v. Wyoming*, 902 F.2d 1482 (10th Cir. 1990), for the purposes of determining whether extraordinary circumstances exist:

> The circumstance most often considered for treatment as "extraordinary" is reliance upon the advice of counsel. Of course such reliance is not inherently extraordinary, for few things in government are more common than the receipt of legal advice. Still, reliance on the advice of counsel in certain circumstances rises to the level of extraordinary circumstances. . . . Relevant factors include how unequivocal, and specifically tailored to the particular facts giving rise to the controversy, the advice was, whether complete information had been provided to the advising attorney(s), the prominence and competence of the attorney(s), and how soon after the advice was received the disputed action was taken.

*Davis v. Zirkelbach*, 149 F.3d 614, 620 (7th Cir. 1998) (quoting *V-1 Oil Co.*, 902 F.2d at 1488-89)).

Here, it is undisputed that Ditlefsen met with District Attorney Steffen *multiple* times to discuss this case during her investigation, as well as that Steffen both made the decision *and* advised Ditlefsen to arrest Burritt. Reviewing the factors from *V-1 Oil Company*, they support the applicability of the extraordinary circumstances doctrine here. Steffen was

admitted to the Wisconsin Bar in 1998, practiced family law and criminal defense, began serving as the Polk County District Attorney in 2007, and handles most of the felony cases for the D.A.'s office, making him both prominent and presumptively competent in these types of matters.  Steffen also reviewed the case and the underlying evidence, including:  the SMH interview; the statements and interviews from Dawn Schultz, Todd Schultz and Impact; and the reports of law enforcement, meaning that his advice was "specifically tailored" to this controversy and its facts.[12]  Moreover, Steffen's advice was precise and unequivocal: the parties do not dispute that Steffen told Ditlefsen to take Burritt into custody without a warrant.  (*See* Pl.'s Resp. to DPFOF (dkt. #50) ¶ 220.)  Even more telling, the Polk County circuit judge independently *found* probable cause to issue warrants to seize Burritt's GPS unit and cell phone at the same time.  Finally, Ditlefsen promptly acted on the district attorney's legal advice and unequivocal instruction: the parties agree that Ditlefsen and Steffen likely met on December 5; that Ditlefsen tried to take Burritt into custody on December 6; and that the arrest actually occurred on December 7.  (*Id.* at ¶¶ 218, 224, 225-27.)

In opposition, Burritt argues that there were no "exigent circumstances" requiring an unwarranted arrest because Burritt was not fleeing from the law at the time of his arrest.  Burritt's argument confuses "exigent" with "extraordinary" circumstances as set forth in *Zirkelbach.*  While the former may or may not have been present given the gravity of the crime Burritt was alleged to have committed, both the apparent necessity *and* the district

---

[12] Burritt disputes this proposed fact but offers no admissible evidence that contradicts it, saying only that Steffen admitted there were some discrepancies in SMH's report, which is irrelevant to the actual, proposed factual finding.  (*See* Pl.'s Resp. to DPFOF (dkt. #50) ¶ 207.)  Accordingly, the court deems this fact undisputed.

attorney's unequivocal direction to arrest a suspected child molester was sufficient to extend the doctrine's protection to Ditlefsen's decision to act as directed.  As the United States Supreme Court has observed,

> A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does.

*Pierson v. Ray*, 386 U.S. 547, 555 (1967).

While Burritt is technically correct that reliance on counsel's advice alone is not enough to demonstrate extraordinary circumstances, *see Zirkelbach*, 149 F.3d at 620 (citing *Buonocore v. Harris*, 134 F.3d 245, 252-53 (4th Cir. 1998)), this is *not* a case in which defendants rely on nothing more than counsel's advice.  Rather, this is a case featuring most, if not all, of the "circumstances" that justify the application of the extraordinary circumstances doctrine as set forth in *V-1 Oil Company* and adopted by the Seventh Circuit in *Zirkelbach*.  Like the officers in *Zirkelbach*, Ditlefsen's decision to rely on Steffen's advice was objectively reasonable, making it appropriate to grant her qualified immunity on those grounds, to avoid creating the "perverse incentive[]" of punishing her decision to seek legal advice while potentially rewarding "deliberate ignorance."  *Zirkelbach*, 149 F.3d at 620.

### B.  Claims against Polk County

Municipalities and local government units are considered to be "persons" to whom § 1983 liability applies, but cannot be held liable under § 1983 on a theory of *respondeat superior*.  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690-91 (1978).  Rather, a local government may be sued under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said

to represent official policy, inflicts the injury." *Id.* at 694.  Thus, to prove Polk County

liable for the alleged Fourth Amendment violations, Burritt must show: "(1) he suffered a

deprivation of a federal right; (2) as a result of either an express municipal policy,

widespread custom, or deliberate act of a decision-maker with final policy-making authority

for the [County]; which (3) was the proximate cause of his injury." *Ovadal v. City of

Madison, Wis.*, 416 F.3d 531, 535 (7th Cir. 2005).

Burritt's primary theory of liability depends on Steffen, as the Polk County District

Attorney, being deemed a decision-maker with "final policy-making authority," as he

presents no evidence suggesting that there is some express municipal policy or widespread

custom at play here.  But as defendants have made clear, the Polk County Sheriff's

Department has its own policies for making arrests, as written in the employee handbook.

(*See* Moe Decl. Ex. 1 (dkt. #36-1).)  Chief Deputy Steven B. Moe has also averred that he

has "primary responsibility for implementing and enforcing all PCSD policies and

procedures."  (Moe Decl. (dkt. #36) ¶ 5.)  Beyond simply stating that the Polk County

District Attorney has broad plenary powers over the prosecution of criminal actions, certain

civil actions, and the administration of the prosecutorial unit, *see* Wis. Stat. § 978.05,

Burritt provides no evidence that Steffen has final policy-making authority in the realm of

law enforcement, much less effecting arrests, and the court declines to find that a policy-

maker in *one* sphere necessarily has such authority in other matters.  *See McMillian v. Monroe

Cnty., Ala.*, 520 U.S. 781, 785 (1997) ("Our cases on the liability of local governments

under § 1983 instruct us to ask whether governmental officials are final policymakers for

the local government in a particular area, or on a particular issue.") (citing *Jett v. Dallas

Independent Sch. Dist.*, 491 U.S. 701, 737 (1989).  On this record, the court simply cannot

say that, assuming Ditlefsen *did* violate Burritt's constitutional rights, Polk County is liable for that violation under *Monell*.

Burritt's complaint states an alternative ground for Polk County's liability: its failure to train and supervise Ditlefsen. The Supreme Court has held that "the inadequacy of police training may serve as the basis for § 1983 liability, [but] only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). The appropriate focus is the "adequacy of the training program in relation to the tasks the particular officers must perform." *Id.* at 390. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city[.]" *Id.* "Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *Id.* at 391. In contrast, if the need for more or different training is obvious in light of the duties assigned to particular officers, and the inadequacy is sufficiently likely to result in the violation of constitutional rights, the municipality may be liable under the deliberate indifference standard articulated in *City of Canton*. *See Graham v. Sauk Prairie Police Comm'n*, 915 F.2d 1085, 1101-02 (7th Cir. 1990) (applying principles of *City of Canton*).

Defendants point out, and Burritt does not dispute, that Ditlefsen received specialized training from the Department of Justice and Fox Valley Technical College on child interviewing techniques and that she has attended FBI training on investigating crimes against children. (Pl.'s Resp. to DPFOF (dkt. #50) ¶¶ 12-13.) Also undisputed is the fact that Ditlefsen conferred with her supervisor, Captain Steve Smith, and District Attorney Steffen on multiple occasions before Burritt's arrest. (*Id.* at ¶¶ 190-91.) In fact, Burritt

points neither to a particular flaw in Polk County's training or supervision of its police officers, nor to a proposed finding of fact to that effect.

At summary judgment, "a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).  Because Burritt has adduced *no* evidence to support his failure-to-train theory, no reasonable trier of fact could adopt that theory and Polk County is also entitled to summary judgment.

## II. State Law Claims

Burritt's remaining claims against Ditlefsen and Polk County arise under state common law.  While defendants ask the court to address their merits as well, the court has already ruled on "all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "[W]hen the federal claims fall out before trial," the Seventh Circuit generally advises that "the judge should relinquish jurisdiction over any supplemental (what used to be called 'pendent') state law claims in order to minimize federal judicial intrusion into matters purely of state law." *Carr v. CIGNA Secs., Inc.*, 95 F.3d 544, 546 (7th Cir. 1996).  The Seventh Circuit has recognized certain exceptions to this general rule when "the factors of judicial economy, convenience, fairness and comity" weigh in favor of addressing state law claims on their merits even after all federal claims have been dismissed. *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994).  For example, a district court might choose to address the merits of state law claims "when it is absolutely clear how the pendent claims can be decided."  In particular, when a court "in deciding a federal claim, decides an issue dispositive of a pendent claim, there is no use leaving the latter to the state court." *Id.*

Here, Burritt alleges state law claims for (1) common law false imprisonment; (2) common law defamation; (3) common law malicious prosecution; and (4) common law negligence. After reviewing the elements of these state law claims, the court does not believe it is appropriate to continue to exercise supplemental jurisdiction over them. The court has not decided any issue that is dispositive with regard to those claims, and so it will follow the Seventh Circuit's general rule to avoid intrusion into state law matters.[13]

ORDER

IT IS ORDERED that:

(1) Defendants Lisa Ditlefsen and Polk County's motion for summary judgment (dkt. #31) is GRANTED IN PART as set forth above;

(2) Plaintiff Paul Burritt's claims for false arrest and imprisonment in violation of the Fourth Amendment are DISMISSED with prejudice; and

(3) Plaintiff's state law claims are DISMISSED WITHOUT PREJUDICE.

Entered this 24th day of February, 2014.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

---

[13] While *actual* probable cause would appear to be dispositive of the common law false imprisonment claim, *see Stern v. Thompson & Coates, Ltd.*, 185 Wis. 2d 220, 251, 517 N.W.2d 658 (1994), and the malicious prosecution claim, *see Strid v.* Converse, 111 Wis. 2d 418, 423, 331 N.W.2d 350 (1983), the court did not find actual probable cause was present here as a matter of law.